JEAN-PAUL JASSY, SBN 205513
 jpjassy@jassyvick.com
AMANDA HARRIS, SBN 353438
 aharris@jassyvick.com
JASSY VICK CAROLAN LLP
355 S. Grand Ave., Suite 2450
Los Angeles, CA 90071
Telephone:  310.870.7048
Facsimile:   310.870.7010


RENEE M. GRIFFIN*
 rgriffin@rcfp.org
GRAYSON CLARY*
 gclary@rcfp.org
ADAM A. MARSHALL*
 amarshall@rcfp.org
REPORTERS COMMITTEE FOR
FREEDOM OF THE PRESS
1156 15th St. NW, Suite 1020
Washington, D.C. 20005
Telephone: 202.795.9300
Facsimile:  202.795.9310

*pro hac vice petition forthcoming

Attorneys for Plaintiff LAUREN TOMASI

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| LAUREN TOMASI,<br><br>               Plaintiff,<br><br>    v.<br><br><br>CITY OF LOS ANGELES, a municipal entity, and JOHN DOE, officer of the Los Angeles Police Department, in his individual capacity,<br><br>               Defendants. | CASE NO. 2:26-cv-6184<br><br><br>**COMPLAINT FOR DECLARATORY RELIEF AND DAMAGES**<br><br><br>**DEMAND FOR JURY TRIAL** |

**INTRODUCTION**

1.    On June 8, 2025, journalist Lauren Tomasi—a reporter for Australian news network Channel Nine—set out on her third day of reporting on protests in Los Angeles responding to a surge of immigration enforcement operations in the city by U.S. Immigration and Customs Enforcement ("ICE").

2.    While covering the protests, Ms. Tomasi held press credentials that clearly identified her as a reporter and carried a large microphone with a blue windscreen and the "9 NEWS" logo.  She also traveled with a cameraman who carried a commercial-size television camera rig on his shoulder, along with other equipment. A screenshot of Ms. Tomasi reporting on that day—seconds before the incident giving rise to this suit occurred—is below.[1]



3.    Around 5pm, Ms. Tomasi and her cameraman set up at the corner of North Los Angeles Street and Temple Street in downtown Los Angeles, approximately

---

[1]    9 News Australia, *LA Protests: Reporter Shot with Rubber Bullet LIVE on TV | 9News Australia*, YouTube (June 8, 2025), https://perma.cc/GK5U-SDNM.  This video is incorporated by reference in this complaint.

ten yards in front of a line of Los Angeles Police Department ("LAPD") officers who had recently cleared the intersection. As a reporter with more than a decade of experience, Ms. Tomasi felt that the location was safe to stop moving and begin filming a report because LAPD had ceased pushing protesters from the area, protesters in the area had calmed, and other members of the press stood nearby on the same street corner.

4. At approximately 5:08pm, Ms. Tomasi and her cameraman began filming a news report that was being fed live to the studio in Australia for use in the evening news.

5. Posing no threat, and with her back to the LAPD officers standing in the intersection, Ms. Tomasi looked into the camera facing her and spoke into her 9 News microphone to make her report. But as she did so, an LAPD officer (JOHN DOE) in the line behind her suddenly pointed his weapon directly at Ms. Tomasi. Without warning or any provocation from Ms. Tomasi, he fired at her while her back was turned.

6. The projectile fired by the LAPD officer struck Ms. Tomasi in the leg. She cried out in pain. Ms. Tomasi could not put weight on the leg that was shot, so her cameraman helped her leave the scene immediately to avoid further harm by LAPD.

7. Because Ms. Tomasi's report was being sent to the studio live, the entire event was captured on video, broadcast, and sparked outrage worldwide.

8. For doing her job and engaging in constitutionally protected newsgathering, Ms. Tomasi suffered severe emotional distress as well as great bodily injury to her leg. For months, the traumatic memory of the shooting hindered Ms. Tomasi's ability to go to work every day and report the news, in addition to affecting her personal life and well-being. Ms. Tomasi continues to be affected by the shooting.

9. LAPD's use of force against Ms. Tomasi was plainly excessive and violated her First and Fourth Amendment rights under the U.S. Constitution, and her rights under the California Constitution. Ms. Tomasi posed no threat whatsoever to

officers, had committed no crime, and was standing well apart from any other imaginable target.

10.    In fact, Ms. Tomasi was visibly and lawfully reporting on newsworthy events in a public forum at the time of the shooting, a right protected by both the First and Fourteenth Amendments and the California Constitution.  But LAPD nevertheless targeted and deliberately retaliated against her for exercising her constitutional rights.

11.    The assault on Ms. Tomasi was, unfortunately, not an anomaly.  Despite internal policies and state legislation passed specifically to address this ongoing misconduct, LAPD officers have continued to carry out a practice of intentionally targeting journalists, including through the unlawful use of crowd control munitions like rubber bullets, and impeding reporters from doing their jobs.

12.    LAPD's custom or practice of targeting reporters during protests and using excessive force against them was particularly on display during the anti-ICE protests in June 2025.  Multiple examples of such misconduct by LAPD—including shooting Ms. Tomasi—were the basis for a lawsuit before this Court seeking injunctive relief that resulted in the entry of a preliminary injunction because LAPD "has a consistent custom or practice of dispersing the press and subjecting them to unlawful uses of force." *Los Angeles Press Club v. City of Los Angeles*, 799 F. Supp. 3d 1007, 1032 (C.D. Cal. 2025).[2]  That established and unlawful custom and practice was being carried out by LAPD officer DOE when he inflicted Ms. Tomasi's injuries here.

13.    Ms. Tomasi brings this action to seek redress for the harm Defendants inflicted on her constitutional rights, as well as her physical and emotional well-being, simply because she was a journalist seeking to report on protests of significant public interest.

---

[2]    The City appealed the injunction, but the appeal is currently stayed pending mediation.  *See Los Angeles Press Club v. City of Los Angeles*, No. 25-6331, ECF No. 28 (9th Cir. Dec. 9, 2025).

## JURISDICTION AND VENUE

14.    This Court has subject matter jurisdiction over Ms. Tomasi's federal claims pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3), and supplemental jurisdiction over her state law claims pursuant to 28 U.S.C. § 1367 because those claims form part of the same case or controversy as her federal claims under 42 U.S.C. § 1983.

15.    All prerequisites to bringing suit, if any, including those imposed by the California Tort Claims Act, Cal. Gov't Code §§ 910 *et seq.*, are satisfied.  Ms. Tomasi filed a notice of administrative claims under the Act with Defendant City of Los Angeles on November 7, 2025, within the statutorily prescribed six-month period.  The City failed to respond within forty-five days, rendering her state law claims ripe for commencement in this Court.  Cal. Gov't Code. §§ 911.2(a), 912.4(a), 945.6(a)(2).

16.    Venue is proper in the Central District of California under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to Ms. Tomasi's claims occurred in this District.

## PARTIES

17.    Ms. Tomasi is and was at all relevant times a reporter for Channel Nine (a.k.a. 9 News), an Australian news network.  Ms. Tomasi has worked as a reporter since 2013 and has been employed by Channel Nine for more than ten years.  She was previously a journalist with Channel Nine in Sydney, Australia, before beginning a foreign secondment as a U.S. Correspondent for Channel Nine in Los Angeles.  Ms. Tomasi is currently Channel Nine's Washington, D.C.-based U.S. Correspondent.  At the time of the incident giving rise to this complaint, Ms. Tomasi was a resident of Los Angeles County, California.  She currently resides in Washington, District of Columbia.

18.    Defendant CITY OF LOS ANGELES ("City") is and was at all relevant times a municipal corporation duly organized under the Constitution and laws of the State of California.  At all relevant times, Defendant City was responsible for ensuring

4

that the actions, omissions, policies, practices, and customs of the LAPD and its employees and agents complied with the laws of the United States and the State of California.

19.　Ms. Tomasi is unaware of the true name and identity of JOHN DOE and has therefore sued him using a fictitious name. On September 9, 2025, Ms. Tomasi's counsel submitted a request for public records related to this incident, including the officer's identity, pursuant to the California Public Records Act, Gov't Code §§ 7920.005 *et seq.*, and California Penal Code § 832.7. The request was denied. On information and belief, JOHN DOE is an LAPD agent or officer employed by Defendant City who targeted and shot Ms. Tomasi with a projectile. DOE is sued in his individual capacity.

## FACTUAL ALLEGATIONS

**A.　Ms. Tomasi's rights were violated by DOE and the City on June 8, 2025, causing her injury and emotional distress.**

20.　In early June 2025, protests against ICE-led immigration sweeps arose in downtown Los Angeles. The protests began on June 6, 2025 and continued for several days in Los Angeles, expanding to other U.S. cities during the same period.[3]

21.　As U.S. Correspondent for Channel 9, Ms. Tomasi covered the protests on June 6 and June 7, 2025, without incident.

22.　At approximately 10am local time on June 8, 2025, Ms. Tomasi began covering that day's protests. She and her cameraman James Phillips, who carried Channel Nine's commercial television camera and other equipment, started their workday outside the Federal Building at 300 North Los Angeles Street, where the ICE Field Office was located. Ms. Tomasi had an LAPD-issued press pass in her pocket.

---

[3]　Bora Erden, *Maps and Timeline of the L.A. Immigration Protests and the Federal Response*, N.Y. Times (June 12, 2025), https://perma.cc/7WKJ-WG9D.

23. At that time, around 150 peaceful protesters were concentrated in that part of downtown Los Angeles, though their numbers grew to thousands as the day progressed.

24. Situated along the streets and sidewalks outside the Federal Building—never behind a police line or in any location where police asked her to leave—Ms. Tomasi filed updates with Channel Nine every half hour, starting at approximately 12pm.[4] At no point did Ms. Tomasi directly interact with any LAPD officers.

25. At approximately 5pm, Channel Nine cut live to Ms. Tomasi standing near the intersection of Temple Street and Alameda Street, reporting on the movement of protesters from the 101 Freeway to the streets of downtown Los Angeles. Behind her, a police line formed and mounted police began to arrive. Ms. Tomasi stood apart from the mass of protesters, not among them, holding her microphone with the 9 News logo and speaking into the camera.

26. At approximately 5:02pm, mounted LAPD police began moving toward Ms. Tomasi and the protesters. Ms. Tomasi moved down the street while still broadcasting live, endeavoring at all times to comply with police instructions. Speaking live to the in-studio anchors, Ms. Tomasi said she would "step off to the side" of the street in an effort to get out of the thick of the protests as police advanced.

27. At approximately 5:04pm, protesters started yelling at Ms. Tomasi while she was live on air. The studio ended the live segment so that Ms. Tomasi and Mr. Phillips could move to a safe location.

28. Between approximately 5:04pm and 5:08pm, Ms. Tomasi and Mr. Phillips moved a few yards south to find a quieter and safer location to film their next segment. They stopped at the northeast corner of North Los Angeles Street and East

---

[4] Clips from Ms. Tomasi's coverage throughout that day are available on YouTube, *see* 9 News Australia, *LA Protests: Full Coverage of the Chaos as it Happened | 9News Australia*, YouTube (June 8, 2025), https://perma.cc/4U9P-EC9Z. The clips demonstrate that Ms. Tomasi was at all times lawfully and peacefully covering the protests.

Temple Street. LAPD officers had recently cleared that intersection of protesters and now stood in a line—some on foot, some mounted on horseback—blocking cars and protesters from traveling east on Temple Street into downtown. By approximately 5:08pm, the LAPD officers had stopped pushing forward and stood passively in their line blocking eastbound traffic.

29. Because protesters and police had appeared to calm, Ms. Tomasi and Mr. Phillips stood several yards in front of the LAPD officers and began filming a piece to camera to include in the evening news report, which was being fed live to the studio in Australia to be viewed by the production team but was not immediately broadcast live to the audience.

30. Ms. Tomasi was positioned on the street north of the intersection, close to other journalists reporting and taking photographs from the same location. Her back was to the line of LAPD officers, including DOE, as she believed they were no threat to her.

31. Based on her years of experience reporting from the field, including days of reporting on protests in Los Angeles, Ms. Tomasi believed the location was safe and out of the way of law enforcement activity. Mr. Phillips, who has worked at Channel Nine for more than 20 years and has filmed in multiple conflict zones throughout the Middle East, likewise believed it was a safe location to stop and record.

32. Ms. Tomasi held a prominent blue microphone with a 9 News logo printed on it and spoke into the camera facing her. The wireless receiver for Ms. Tomasi's microphone was visible and attached to the back of her belt. She was clearly identifiable as a television reporter doing her job.

33. Just as Ms. Tomasi said the final words of her report, the LAPD officer closest to her—Officer DOE, who was still several yards away in the intersection behind Ms. Tomasi—turned to his right, aimed his weapon, and fired directly at Ms. Tomasi.

34.     The projectile fired by DOE hit Ms. Tomasi's lower left leg.  She cried out in pain and surprise.

35.     DOE did not give—and Ms. Tomasi did not hear—any warning before the officer fired his weapon.  Ms. Tomasi had not been asked by any person to move, stop filming, or otherwise change her location or behavior before she was shot by DOE.

36.     All of this was captured on the footage that Ms. Tomasi was recording. Producers in the Channel Nine studio watched it live and feared for their colleague's well-being.  The video quickly became public.[5]  Below is a screenshot from that video, showing the moment DOE (pictured on the left) shot Ms. Tomasi.



37.     Ms. Tomasi was plainly engaged in protected First Amendment activity— gathering and broadcasting the news—at the time she was shot.

38.     On information and belief, DOE intended to force Ms. Tomasi to stop reporting on the protests and cease filming LAPD activity by shooting her.

39.     As a result of being shot, Ms. Tomasi was forced to cease filming her piece and leave the area as soon as possible with the help of Mr. Phillips.  She

_____

[5]     *See* 9 News Australia, *supra,* note 1.

experienced severe pain in her leg and shock that caused uncontrollable shaking and could not put weight on her left leg.

40.    Despite the severe pain, Ms. Tomasi was determined to continue her reporting.  After relocating and regaining her composure, she filmed a live report that aired on Channel Nine at 6:30pm local time, another segment at 11pm, and a final segment at 2am.

41.    At 3:30am, Ms. Tomasi finally arrived back at her home in Los Angeles. She saw, for the first time, the large bruise forming on her leg where the projectile struck her.  As the adrenaline faded her pain increased.  She tried to sleep that night but could not.

42.    The next day, June 9, Ms. Tomasi went to urgent care to seek treatment for her physical injury (pictured below, as it appeared at approximately 8am on June 9).  Medical staff identified swelling, tenderness, and a contusion on her left calf and provided Ms. Tomasi with a compression bandage and care instructions.



43.    In the days after the shooting, Ms. Tomasi received an outpouring of attention on social media and multiple calls from people who had watched the video of the shooting, including outreach from the Channel Nine CEO; the Italian Consulate (Ms. Tomasi has dual Australian-Italian citizenship); the Australian Ambassador to the

United States; and the Australian Prime Minister.  All shared their outrage at what the LAPD had done.

44.    Ms. Tomasi suffered and continues to suffer substantial and ongoing injury from the shooting, both mentally and physically.  She was diagnosed with plantar fasciitis and referred to physical therapy due to the injury to her leg.  Continued pain from the injury impacted her day-to-day life for months.  Ms. Tomasi has also been diagnosed with post-traumatic stress disorder as a result of the shooting and struggled to make it through a workday in the months after the shooting, to the point that she had to take leave from her job.  She receives regular mental health treatment from a licensed therapist but continues to be emotionally distressed by the shooting to this day.

45.    These harms to Ms. Tomasi were caused directly and exclusively by being shot in the leg by DOE, who was acting in the scope of his employment with the Los Angeles Police Department and under the direction of City officials.

**B.    Ms. Tomasi's shooting exemplified LAPD's policy and practice of violating the rights of reporters covering protests.**

46.    LAPD's policy and practice of targeting and using excessive force against reporters covering protests is pervasive and longstanding, going back decades and reaching a zenith during the June 2025 anti-ICE protests covered by Ms. Tomasi.

47.    In 2000, seven journalists were assaulted by LAPD officers during a protest outside the Democratic National Convention in Los Angeles.[6]  The LAPD shot several of the journalists with rubber bullets.  The Los Angeles City Council's settlement with the journalists required LAPD to implement a policy recognizing the press' right to cover unlawful public assemblies.[7]

---

[6]    *Journalist, LAPD settle lawsuit over attacks during convention*, Reps. Comm. for Freedom of the Press (Oct. 12, 2001), https://perma.cc/3RVP-U7VX.

[7]    *Id.*

48.   In 2007, LAPD officers weaponized batons and riot guns against multiple reporters and camera operators during an immigrant rights rally in MacArthur Park, including those who were preparing to film live broadcasts, holding microphones, and standing in front of camera gear.[8]

49.   In 2020, photojournalist Barbara Davidson, was covering one of the protests ignited by the police killing of George Floyd when an LAPD officer ordered her to leave the area near the Grove shopping mall.[9] Ignoring Ms. Davidson's announcement that she was a journalist, the officer shoved her from behind, causing her to lose her balance and strike her head on a fire hydrant.[10] That same year, freelance journalist and National Press Photographers Association member Julianna Lacoste was shot with crowd-control munitions, assaulted, and arrested by LAPD officers while covering a protest outside of the Los Angeles County Sheriff's Department.[11] At the time of the assault and arrest, she was wearing a helmet that read "PRESS" and had a press badge in her bag.[12]

50.   In 2021, the California Senate passed Senate Bill 98, prohibiting law enforcement officers from assaulting, interfering with, or obstructing journalists covering protests and related events.[13] Senator Mike McGuire authored the bill in response to "a surge in egregious acts of violence and obstruction made against

---

[8]   Anna Gorman and Stuart Silverstein, *Police action against journalists assailed*, L.A. Times (May 3, 2007), https://perma.cc/J8GS-7YEY.

[9]   Marc Tracy and Rachel Abrams, *Police Target Journalists as Trump Blames 'Lamestream Media' for Protests*, N.Y. Times (Aug 1, 2020), https://perma.cc/HC4D-5492.

[10]   *Id.*

[11]   *Freelance journalist assaulted, arrested during LA protest*, U.S. Press Freedom Tracker (May 18, 2023), https://perma.cc/6BA5-JP2B; *Julianna Lacoste v. County of Los Angeles*, No. 2:23-cv-4917, Compl. (C.D. Cal. June 21, 2023).

[12]   *Id.*

[13]   S.B. 98 (Cal. 2021), available at https://perma.cc/4EJE-GQZK; Andrew Sheeler, *Gavin Newsom signs law giving journalists unrestricted access to protests closed by police*, The Sacramento Bee (Oct. 10, 2021), https://perma.cc/6XGX-XTV9.

members of the press[.]"[14]  The bill was signed into law by Governor Gavin Newsom on October 9, 2021, and codified at Cal. Penal Code § 409.7.

51.     Despite the new legislation, incidents of law enforcement officers interfering with members of the press in Los Angeles have continued.  This pattern of interference became particularly prevalent among Los Angeles law enforcement agencies in June 2025, while Ms. Tomasi was working in Los Angeles.

52.     On June 10, 2025, Jalyssa Dugrot, a MintPress News reporter covering a "No Kings" protest in downtown Los Angeles, was among multiple reporters blocked from accessing part of the protest.[15]  Ms. Dugrot explained to LAPD officers that she was a journalist who needed access to cover the protest before entering the area whereupon officers shot her in the leg with crowd-control munitions, detained her, and zip-tied her.

53.     From June 6 to June 9, 2025, LAPD shot multiple journalists with projectiles.[16]  In addition to Ms. Tomasi, at least five journalists were injured by LAPD officers while attempting to report on the protests, including Livia Albeck-Ripka of the New York Times (shot by a projectile on June 8, 2025);[17] Jeremy Lindenfeld of Capital & Main (shot by a projectile on June 9, 2025);[18] Sergio Olmos of CalMatters

[14]  Don Thompson, *California protects reporters covering protests with new law*, KPBS (Oct. 11, 2021), https://perma.cc/QW5L-4FVX.

[15]  *Reporter struck with police projectile, detained at LA protest*, U.S. Press Freedom Tracker (June 14, 2025), https://perma.cc/Z24S-F82C; Jalyssa Dugrot, *Free Speech ends here: What I saw during the LAPD crackdown*, Monthly Review Online (June 12, 2025), http://bit.ly/4m99LdT.

[16]  *See Law enforcement injure multiple journalists; others assaulted while covering Los Angeles protests*, Comm. to Protect Journalists (June 9, 2025), https://perma.cc/C4Q3-M3AL.

[17]  Livia Albeck-Ripka, et al., *A look at the crackdown on the L.A. protests,* N.Y. Times (June 10, 2025), https://perma.cc/77P3-5VML.  *See also Los Angeles Press Club v. City of Los Angeles,* Case No. 2:25-cv-05423, Compl. ¶ 26 (C.D. Cal. June 16, 2025).

[18]  Jeremy Lindenfeld (@jeremotographs.bsky.social), Bluesky (June 9, 2025, 10:38 PM) https://perma.cc/NFU3-KHWN.  *See also Los Angeles Press Club,* Case No. 2:25-cv-05423, Compl. ¶ 27 (C.D. Cal. June 16, 2025).

(shot with a projectile on June 8, 2025);[19] Ford Fischer, a documentary filmmaker (struck by a projectile on June 9, 2025);[20] and Gabriel Ovalle of Channel 5 (shot with a projectile on June 10, 2025).[21]

54.    To avert further LAPD violence against journalists, the Los Angeles Press Club and media outlet Status Coup filed a lawsuit against the City on June 16, 2025, seeking to enjoin the City and its police department from further violating reporters' constitutional and statutory rights. *See Los Angeles Press Club*, Case No. 2:25-cv-05423, Compl.

55.    Reviewing the evidence and arguments marshaled in that case, the Honorable Hernán D. Vera of this Court concluded that "the LAPD has a consistent custom or practice of dispersing the press and subjecting them to unlawful uses of force." *Los Angeles Press Club*, 799 F. Supp. 3d at 1032.

56.    That custom and practice was being carried out against Ms. Tomasi—whose shooting this Court specifically identified as a piece of relevant evidence in the *Los Angeles Press Club* case:

> On the same day, Lauren Tomasi of 9News Australia was speaking into a professional TV camera, dozens of feet from the line of officers behind her. Protestors are visible behind, but not immediately near her. Despite this, an LAPD officer aims in Tomasi's direction, hitting her leg with a rubber bullet.

*Id.* at 1018 (internal citations omitted).

---

[19]  Scott Nover & Jeremy Barr, *Journalists come under fire covering L.A. protests*, The Washington Post, (June 10, 2025), https://wapo.st/48lDkmH. *See also Los Angeles Press Club,* Case No. 2:25-cv-05423, Compl. ¶ 28 (C.D. Cal. June 16, 2025).

[20]  Ford Fischer (@FordFischer), X (June 10, 2025, 1:14 AM), https://perma.cc/Z679-Q8RX. *See also Los Angeles Press Club,* Case No. 2:25-cv-05423, Compl. ¶ 29 (C.D. Cal. June 16, 2025).

[21]  Channel 5 (@channel5ivenews), X (June 10, 2025, 1:59 PM), https://perma.cc/AE69-B83L. *See also Los Angeles Press Club,* Case No. 2:25-cv-05423, Compl. ¶ 30 (C.D. Cal. June 16, 2025).

57.    Ms. Tomasi's injury was caused by LAPD's custom and practice of unlawfully targeting and using excessive force against reporters covering protests.

## CLAIMS FOR RELIEF

### COUNT I

### 42 U.S.C. § 1983 – Violation of the First Amendment

### (Interference with Newsgathering)

*Against JOHN DOE in his individual capacity*

58.    Ms. Tomasi re-alleges and incorporates by reference the preceding paragraphs of the Complaint.

59.    DOE's attack on Ms. Tomasi prevented her from exercising her First Amendment right to observe and record police activity in public.  *See Reed v. Lieurance*, 863 F.3d 1196, 1211 (9th Cir. 2017); *Fordyce v. City of Seattle*, 55 F.3d 436, 439 (9th Cir. 1995).

60.    DOE's actions were not narrowly tailored to a significant governmental interest because "there was no genuine safety or operational reason" to shoot Ms. Tomasi.  *Reed*, 863 F.3d at 1212.

61.    DOE's actions left Ms. Tomasi with no alternative opportunity to document DOE or any other LAPD officer's performance of his duties.

62.    In taking these actions, DOE acted under color of state law.

63.    In taking these actions, DOE acted maliciously and with reckless disregard for Ms. Tomasi's constitutional rights.

64.    DOE's unconstitutional conduct proximately caused Ms. Tomasi physical injury and emotional distress.

### COUNT II

### 42 U.S.C. § 1983 – Violation of the First Amendment

### (Retaliation)

*Against JOHN DOE in his individual capacity*

14

65. Ms. Tomasi re-alleges and incorporates by reference the preceding paragraphs of the Complaint.

66. Ms. Tomasi was engaged in activity protected by the First Amendment when, in a public forum, she reported on LAPD's response to ICE-related protests in Los Angeles in June 2025.

67. On information and belief, DOE's decision to shoot Ms. Tomasi was substantially motivated by the exercise of her right to record and represented an effort to prevent her and other journalists from documenting the conduct of LAPD officers that evening.

68. DOE's decision to shoot Ms. Tomasi was not supported by probable cause or a reasonable but mistaken belief that probable cause existed. Ms. Tomasi did not interfere, willfully or otherwise, with the performance of DOE's or any other LAPD officer's duties; she was not given an opportunity to comply with any order to back up; and she was targeted based on her exercise of her right to record law enforcement activity. *See* Cal. Penal Code §§ 148(a)(1), (g); Cal. Penal Code § 409.7; *Mackinney v. Nielsen*, 69 F.3d 1002, 1007 (9th Cir. 1995).

69. Ms. Tomasi's shooting would chill a person of ordinary firmness from continuing to exercise her right to document and report on policing and protests in public. The shooting did in fact prevent Ms. Tomasi from continuing to report on the protest and police activity for a period of time.

70. In taking these actions, DOE acted under color of state law.

71. In taking these actions, DOE acted maliciously and with reckless disregard for Ms. Tomasi's clearly established constitutional rights.

72. DOE's unconstitutional conduct proximately caused Ms. Tomasi physical injury and emotional distress.

## COUNT III

### 42 U.S.C. § 1983 – Violation of the Fourth Amendment

### (Excessive Force)

*Against JOHN DOE in his individual capacity*

73. Ms. Tomasi re-alleges and incorporates by reference the preceding paragraphs of the Complaint.

74. DOE aimed his weapon directly at Ms. Tomasi, fired, and struck her in the leg with a projectile, causing her physical harm and impairing her ability to move freely.

75. DOE's use of force against Ms. Tomasi was objectively unreasonable in light of the circumstances. Ms. Tomasi was clearly in the middle of filming a news report, had not committed a crime, and did not pose a threat to DOE or any other officer.

76. In taking these actions, DOE acted under color of state law.

77. In taking these actions, DOE acted maliciously and with reckless disregard for Ms. Tomasi's clearly established constitutional rights.

78. DOE's unconstitutional conduct proximately caused Ms. Tomasi physical injury and emotional distress.

## COUNT IV

### 42 U.S.C. § 1983 – Violation of the Fourteenth Amendment

### (Due Process)

*Against JOHN DOE in his individual capacity*

79. Ms. Tomasi re-alleges and incorporates by reference the preceding paragraphs of the Complaint.

80. The actions of DOE, including targeting Ms. Tomasi while she was rightfully reporting on police activity and using excessive force against her without warning, were deliberately indifferent to the rights and well-being of Ms. Tomasi. The level of force and violence employed by DOE shocks the conscience and violated Ms.

Tomasi's right to due process of law guaranteed by the Fourteenth Amendment of the United States Constitution.

81.    In taking these actions, DOE acted under color of state law.

82.    In taking these actions, DOE acted maliciously and with reckless disregard for Ms. Tomasi's clearly established constitutional rights.

83.    DOE's unconstitutional conduct proximately caused Ms. Tomasi physical injury and emotional distress.

## COUNT V

### 42 U.S.C. § 1983 – Violation of the First Amendment *(Monell)*

*Against City of Los Angeles*

84.    Ms. Tomasi re-alleges and incorporates by reference the preceding paragraphs of the Complaint.

85.    DOE violated Ms. Tomasi's First Amendment right to observe and record public events and associated law enforcement activity and retaliated against her for exercising that right.

86.    LAPD's custom and/or practice of obstructing, interfering with, and otherwise discouraging members of the media and public from recording public events and associated law enforcement activity, as well as its failure to train and supervise its employees and agents on LAPD Policy 1/556.10 restricting the use of force, Cal. Penal Code § 409.7, Cal. Penal Code 409.5(d)(1), and Cal. Penal Code § 13652, likewise caused these violations of Ms. Tomasi's First Amendment rights.

87.    In light of the numerous incidents described herein that have occurred pursuant to this practice and/or custom, the City's failure to train and/or supervise its employees and agents on LAPD Policy 1/556.10 restricting the use of force, Cal. Penal Code § 409.7, Cal. Penal Code 409.5(d)(1), Cal. Penal Code § 13652, and the First Amendment right to record was so obvious, and the inadequacy of training and supervision so likely to result in violation of constitutional rights, that such inaction amounts to deliberate indifference.

17

## COUNT VI

### 42 U.S.C. § 1983 – Violation of the Fourth Amendment (*Monell*)

*Against City of Los Angeles*

88.    Ms. Tomasi re-alleges and incorporates by reference the preceding paragraphs of the Complaint.

89.    DOE violated Ms. Tomasi's Fourth Amendment right to be free from excessive force by shooting her in the leg while she was clearly in the middle of filming a news report, had not committed a crime, and did not pose a threat to DOE or any other officer.

90.    LAPD's practice and/or custom of obstructing, interfering, and otherwise discouraging members of the media and public from recording public events and associated law enforcement activity, as well as its failure to train and supervise its employees and agents on LAPD Policy 1/556.10 restricting the use of force, Cal. Penal Code § 409.7, Cal. Penal Code 409.5(d)(1), and Cal. Penal Code § 13652, caused this violation of Ms. Tomasi's Fourth Amendment rights.

91.    In light of the numerous incidents described herein that have occurred pursuant to this practice and/or custom, the City's failure to train and/or supervise its employees and agents on LAPD Policy 1/556.10 restricting the use of force, Cal. Penal Code § 409.7, Cal. Penal Code 409.5(d)(1), and Cal. Penal Code § 13652 amounts to deliberate indifference.

## COUNT VII

### Cal. Civ. Code § 52.1 – Violation of the Bane Civil Rights Act

*Against City of Los Angeles and JOHN DOE in his individual capacity*

92.    Ms. Tomasi re-alleges and incorporates by reference the preceding paragraphs of the Complaint.

93.    DOE intentionally interfered with, or, at a minimum, acted with reckless disregard for, Ms. Tomasi's rights under the First and Fourth Amendments to the

18

United States Constitution, as well as her rights under Article I, Sections 2, 3, and 13 of the California Constitution, as follows:

a. DOE shot Ms. Tomasi to retaliate against her for exercising her right to observe and record police activity in public under the First Amendment of the United States Constitution; Article I, Section 3 of the California Constitution; and California Penal Code § 409.7, which prohibits law enforcement in police lines at protests from "intentionally assault[ing], interfer[ing] with, or obstruct[ing] the duly authorized representative of any . . . television station or network who is gathering, receiving, or processing information for communication to the public." Cal. Penal Code § 409.7.

b. DOE shot Ms. Tomasi, preventing her from continuing to exercise her right to observe and record police activity in public under the First Amendment of the United States Constitution, and Article I, Section 2 of the California Constitution; and California Penal Code § 409.7.

c. DOE attacked Ms. Tomasi using force that was objectively unreasonable in light of the circumstances, in violation of her right to be free from excessive and unreasonable force under the Fourth Amendment of the United States Constitution; Article I, Section 13 of the California Constitution; and California Penal Code § 13652, which restricts LAPD's use of "kinetic energy projectiles" except where their use "is objectively reasonable to defend against a threat to life or serious bodily injury to any individual, including any peace officer, or to bring an objectively dangerous and unlawful situation safely and effectively under control, and only in accordance with" 10 enumerated requirements. *Id*.

94. As a direct and proximate result of the acts and omissions of DOE, Ms. Tomasi sustained injuries and damages, including physical injury and emotional distress.

95.     Defendant City of Los Angeles is vicariously liable, pursuant to California Government Code § 815.2, for the acts and omissions of its employee, DOE, within the course and scope of his employment.

## COUNT VIII

### Battery by a Peace Officer

*Against City of Los Angeles and JOHN DOE in his individual capacity*

96.     Ms. Tomasi re-alleges and incorporates by reference the preceding paragraphs of the Complaint.

97.     DOE intentionally touched Ms. Tomasi without her consent when he aimed at and struck Ms. Tomasi with a projectile, causing her physical harm and impairing her ability to move freely.

98.     Ms. Tomasi was clearly in the middle of filming a news report, had not committed a crime, and did not pose a threat to DOE or any other officer.

99.     DOE's use of force proximately caused Ms. Tomasi physical injuries and emotional distress.

100.    In taking these actions, DOE acted maliciously and with reckless disregard for Ms. Tomasi's rights and safety.

101.    At all relevant times, DOE was acting in the course and scope of his employment.

102.    Defendant City of Los Angeles is vicariously liable, pursuant to California Government Code § 815.2, for the acts and omissions of its employee, DOE, within the course and scope of his employment.

## COUNT IX

### Negligence

*Against City of Los Angeles and JOHN DOE in his individual capacity*

103.    Ms. Tomasi re-alleges and incorporates by reference the preceding paragraphs of the Complaint.

104. DOE owed Ms. Tomasi "a legal duty either not to use excessive force or to intercede in instances of the use of excessive force." *Knapps v. City of Oakland*, 647 F. Supp. 2d 1129, 1164 (E.D. Cal. 2009), *amended in part*, 2009 WL 10736653 (E.D. Cal. 2009).

105. DOE breached his duty to Ms. Tomasi by using excessive force against her as set forth above.

106. DOE's breach of his duties proximately caused Ms. Tomasi physical injuries and emotional distress.

107. At all relevant times, DOE was acting in the course and scope of his employment.

108. Defendant City of Los Angeles is vicariously liable, pursuant to California Government Code § 815.2, for the acts and omissions of its employee, DOE, within the course and scope of his employment.

## **PRAYER FOR RELIEF**

WHEREFORE, Ms. Tomasi respectfully requests from this Court:

1) A declaratory judgment that Defendants' conduct complained of herein violated Ms. Tomasi's rights under the Constitution of the United States and the California Constitution;

2) General and compensatory damages for Ms. Tomasi from Defendant City for the violations of her rights under federal and California law, including but not limited to pain, suffering, and emotional distress, to be determined according to proof;

3) General, compensatory, and punitive damages for Ms. Tomasi from DOE for the violation of her rights under federal and California law, including but not limited to pain, suffering, and emotional distress, to be determined according to proof;

4) An award of attorney's fees pursuant to 42 U.S.C. § 1988 and Cal. Code Civ. Proc. § 1021.5;

5) Costs of suit;

21

6)    Pre-and post-judgment interest as permitted by law; and

7)    Such other and further relief as the Court may deem just and proper.


Dated:  June 8, 2026

JEAN-PAUL JASSY
AMANDA HARRIS
  JASSY VICK CAROLAN LLP

RENEE M. GRIFFIN
GRAYSON CLARY
ADAM A. MARSHALL
  REPORTERS COMMITTEE FOR
  FREEDOM OF THE PRESS


By:  */s/ Jean-Paul Jassy*
          JEAN-PAUL JASSY

Attorneys for Plaintiff LAUREN TOMASI